# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### HATTIESBURG DIVISION

RHONDA J . DYKES; And
MICHAEL TERRELL DYKES                                                    **PLAINTIFFS**

**VERSUS**                                        **CIVIL ACTION NO. 2:10cv119KS-MTP**

HUSQVARNA OUTDOOR PRODUCTS, N.A., INC.;
AND JOHN DOES A, B & C                                                   **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Motion for Summary Judgment **[#87]** filed on

behalf of the defendant, Husqvarna Consumer Outdoor Products N.A., Inc.

("Husqvarna").[1]  The court, having reviewed the motion, the response, the briefs of

counsel, the pleadings and exhibits on file and being fully advised in the premises finds

that the motion is well taken and should be granted.  The court specifically finds as

follows:

## BACKGROUND

This case involves a used 2004 Craftsman riding lawn tractor manufactured by

Husqvarna.  In the early part of the summer of 2006, a business partner or associate of

Plaintiff Michael Terrell Dykes, John Stanfield, saw a Craftsman Riding Lawnmower

advertised in a local newspaper or advertising listing.  He traveled to the Petal-Sunrise

---

[1] Both parties have motions to strike the other's respective experts as well as various other
motions pending.  However, finding that the present motion is dispositive of all issues negates the
necessity of going to the merits of the other motions.

area to inspect the lawnmower. He cranked it, rode it, mowed with it and purchased it from an unknown individual. Stanfield used the mower to mow his yard as needed for a couple of months and then relocated to California. Since he was not going to need a mower in California, Stanfield sold the mower and some other equipment items to Dykes in approximately August 2006.

Shortly after purchasing the mower, the Dykes relocated from their home in Columbia to some rural acreage outside town. The Dykes have asserted that in hopes of building a home at their property in the country, they relocated a fifth wheel travel trailer to the site along with a 45 foot container trailer that housed their furniture and household items from their home in Columbia. During the period of time that they were living on their acreage in the country, they utilized the mower to mow several strips around the travel trailer. The Dykes contend that when not in use, they kept the mower stored under the fifth wheel hitch area at the front of the travel trailer to keep it out of the weather.

On May 25, 2008, Rhonda Dykes had mown the area around the travel trailer and as it had gotten dark, she left the lawnmower in between the travel trailer and the storage trailer. The following day, May 26, 2008, her son's four wheeler was parked underneath the fifth wheel portion of the travel trailer and therefore Rhonda states that she got on the mower, cranked it and circled around to the front portion of the storage trailer to see if the mower would fit underneath the landing gear and kingpin portion of the trailer so as to keep it out of the weather.

When Rhonda drove up to the side of the front portion of the storage trailer, she has testified that in her judgment, the mower would fit under the trailer, however, it

would not do so with her sitting on it.  As a result, Rhonda testified that as she placed the mower in reverse to back away from the side of the storage trailer she heard a loud squealing noise and saw smoke coming from the belly portion of the mower.  Rhonda stated that when she released the clutch, the mower lunged forward with her in the seat, dragging her underneath the jagged rusty side and bottom portion of the trailer.  The mower apparently proceeded all the way under the trailer until it hit the landing gear on the opposite side and stopped.  Following the accident, the mower remained in that same position, untouched for a period of time.

Michael Dykes was in the yard with Rhonda at the time and saw the mower go under the trailer.  Michael has testified he thought Rhonda was dead due to the amount of blood that he saw on her when he went underneath the trailer to try to remove her.  Rhonda was taken to the emergency room where she was treated by Dr. William Reno, Plastic Surgeon.  Ultimately, Rhonda incurred approximately $24,000 in medical bills.

During her recovery, Rhonda has testified that she began attempting to contact Sears (whom she believed at the time to be the manufacturer of the mower) and finally was able to schedule a product safety inspection through Sears Roebuck & Company. On September 29, 2008, Randy Saulters, an employee of Sears, came to the home, found the mower in its same position against the landing gear underneath the trailer, pulled it out from underneath the trailer and was able to crank it and run it so as to attempt to replicate the same lunging forward action that had been experienced by Rhonda.

Saulters was apparently able to replicate the problem with the mower and attributed it to a problem with the transaxle.  Before leaving, he typed up a ticket for his

service for product safety inspection call and left a copy with the Dykes.  On that printed

ticket, he stated  "Failure in transaxle sticking in multiple gears forward and reverse."

Following the inspection, Rhonda contacted Sears in an attempt to secure

payment for her medical bills, but never received a response.  This lawsuit was

originally filed against Sears Roebuck & Company (as the believed manufacturer of the

product).  However, when the Dykes discovered that the true manufacturer of the

product was Husqvarna Consumer Outdoor Products, N.A., Inc. and that Sears was

only the seller of the product, the Amended Complaint was filed.  Sears has since been

dismissed from this action.

There is no dispute that the tractor's transaxle has a broken shift key.  It is also

undisputed that a broken key may cause the tractor not to shift properly.  The Dykes

contend that the shift key broke because of a manufacturing defect that may have been

present in the transaxle when it left the manufacturer or a design defect.  Husqvarna

argues in this motion that the Dykes cannot meet their burden in this regard.  Thus,

Husqvarna frames the issues addressed in this motion as: (1) Whether the Dykes have

sufficient evidence to establish that the transaxle in their used 2004 Craftsman riding

lawn tractor was defectively manufactured or designed within the meaning of Section

11-1-63 of the Mississippi Product Liability Act; and (2) Whether the Dykes have

sufficient evidence to establish that their used 2004 Craftsman riding lawn tractor was

defective at the time it left Defendants' control.  Husqvarna also attacks the Dykes' other

claims of inadequate warnings, breach of warranty, negligence and entitlement to

punitive damages.

The used 2004 Craftsman riding lawn tractor that Rhonda  was operating on May

26, 2008 was manufactured on October 14, 2004.  Before it left the manufacturer, it is

undisputed the tractor was tested for proper operation and passed inspection.  The

tractor left Husqvarna's control when it was sold to Sears.  There is no evidence in the

record about when the tractor was originally sold by Sears, or to whom, or how that

person used the tractor.  Rhonda has testified that, despite knowing it was not

recommended[2], she would occasionally "shift on the fly," that is, shift into higher or

lower gears without first stopping the tractor.

Husqvarna's post-incident inspection[3] of the lawn tractor revealed, according to

Husqvarna, that at some point in its life, the tractor had been involved in at least one

and possibly two prior collisions.  To support this contention, Husqvarna points first to

the steel fender at the rear of the unit behind the seat, which was bent and significantly

damaged due to an impact at some point.  Second, the left side of the muffler exhaust

shielding was partially dislodged from its normal mount on the front axle bracket.

Husqvarna concedes that while this could arguably have occurred when the

tractor hit the trailer landing gear in Rhonda' incident.  However, it was the right front of

the tractor that hit the landing gear, and the tractor had only minor damage due to that

impact.  Regardless, it is undisputed that this damage would not have existed at the

time the new tractor left Husqvarna's' control, and Husqvarna argues that neither is it

---

[2]  The Operator's Manual for this tractor states "IMPORTANT: Bring the tractor to a complete stop before changing or shifting gears. Failure to do so will shorten the useful life of your transaxle."

[3]  Husqvarna inspected the tractor on September 16, 2011. At that time, the tractor was found in the woods at the back of the Dykes' property, where, the evidence indicates, it had sat, unprotected, since shortly after the incident.  Husqvarna contends it was clear that the Dykes had not had an expert inspect the tractor at any point prior to this date, which was more than 16 months after they filed the Complaint containing allegations of design and manufacturing defects.

consistent with damage from Rhonda's May 26, 2008 incident. Further, according to the Dykes' testimony regarding their post-incident use and storage of the tractor, nothing occurred post-incident that would have caused this left side damage.

Husqvarna also argues the tractor had been poorly maintained. For example, the right front tractor suspension pin had been replaced with a piece of wire. The engine air filter element was extremely dirty, and there was a crack in the engine breather hose. The brake system on the transaxle was unusually full of dirt and debris, and the clutch/brake pedal pad was rotated about 90 degrees out of its normal position. Thus, according to Husqvarna, these, combined with the damage to the tractor discussed above, provide evidence that the tractor had, at the very least, been "used hard," and tend to show that the tractor had been abused or misused during its life by one or all of its at least three different owners.

Rhonda testified that the tractor had been serviced one time by an entity known as Stringers' Repair. According to her, she took it there to "get the oil changed and the blade sharpened, just routine maintenance." However, there is no other evidence in the record about what exactly, if anything, Stringers' Repair did when it serviced the tractor.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). The

existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." Id. "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-

moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalia*n, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also,*

*Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'" *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).


## Mississippi Products Liability Actions

Mississippi's codification of its prior common law of strict  products liability dealing with allegedly defective products is found at Miss. Code Ann. § 11-1-63, the Mississippi Products Liability Act ("MPLA").  That section provides, in pertinent part;

(a)    The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i)    1.  The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

2.  The product was defective because it failed to contain adequate warnings or instructions, or

3.  The product was designed in a defective manner, or

4.   The product breached an expressed warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii)    The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii)    The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Thus, in order to meet their burden of production at this point in the litigation, the Dykes must offer proof that at the time the tractor left the manufacturer, it was "defective," that the defect rendered the tractor "unreasonably dangerous," and that the defective condition of the tractor proximately caused Rhonda's injuries. The Dykes are purportedly proceeding under all four subsections of Section (a)(I) in an effort to advance their claims.

## ANALYSIS

At this point in the litigation, there is no dispute that the tractor had a broken shift key in the transaxle. Nor is there any dispute that the Dykes were at least the third owners of the tractor at issue. There is also no dispute that the tractor's history and use is not completely known. Of primary concern to the continuing viability of this action, however, is the fact that the parties cannot agree upon the cause of the broken shift key. The Dykes allege it was defectively manufactured or designed and Husqvarna alleges the shift key broke as a result of the abuse and misuse of the tractor. According to Husqvarna however, since the Dykes have wholly failed to explain how or why the break occurred beyond the speculative and unsupported claims of their expert, Michael H. DeHarde[4], they cannot meet their burden of going forward in this case.

The Amended Complaint filed in this matter advances claims of negligent design

_____

[4] DeHarde's testimony is the subject of a separate motion to exclude. The court has reviewed DeHarde's testimony in conjunction with this motion and has concluded that it is not sufficient to sustain the Dykes' burden to show that the tractor was defective when it left Husqvarna's control, a prerequisite to proceeding under the MPLA. That being said, it is not necessary for the court to otherwise directly address the motion to exclude DeHarde's testimony beyond the discussion contained hereinafter, nor to address the other pending motions.

of the Sears Craftsman riding lawn tractor, Model DYT40004; negligent manufacture of the tractor; that Husqvarna negligently composed, compiled, published and disseminated an operating manual which failed to adequately instruct and advise of proper and safe use in operation of the lawnmower; that Husqvarna breached its duty to adequately instruct and advise expected users, including the Dykes, as to the proper and safe use and operation of the lawnmower; that Husqvarna breached its duty to perform adequate predeliver inspection of the lawnmower involved; and that Husqvarna failed to adequately warn of dangers and operating characteristics associated with the activation, use and operation of the lawnmower (including the gear shift control and/or transaxle) and committed other negligent acts or omissions to be shown at the trial of this matter. These allegations smack of the typical "shotgun" approach taken in most product liability cases in that such pleading usually precedes an expert analysis of the allegedly defective product.[5]

### Manufacturing Defect

As previously stated, to prove a claim of manufacturing defect under the MPLA, the Dykes must first establish a defect. *See* Miss. Code Ann. § 11-1-63. Specifically, the Dykes must establish that the tractor "deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications." *Shelter Ins. Co. v. Mercedes-Benz USA, LLC*, 236

---

[5] The record reveals that the Amended Complaint was filed seven months before the first inspection of the tractor by the Dykes' expert, Michael DeHarde, and some sixteen months after the filing of the original Complaint. The record also reveals that DeHarde's initial inspection was some three years and four months after Rhonda's accident.

Fed. App'x 45, 46 (5th Cir. 2007) (unpublished opinion) (quoting § 11-1-63(a)(i)(1)).

In his initial report[6] dated September 30, 2011, the Dykes' expert, DeHarde, opined that because the tractor moved forward when the shift selector was placed in neutral, "there was a malfunction or defect." At that time, DeHarde opined only that "a defect exists within the transaxle which *may* have been present when it left the manufacturer." (Emphasis added by the Court). In this initial report, DeHarde conceded that "the exact failure in the transaxle cannot be determined until the transaxle is disassembled." Without identifying any factual support, and not taking into consideration the largely unknown maintenance and use history, DeHarde also concluded that "there was no evidence of misuse or abuse to the lawnmower." DeHarde provided no opinion as to whether the malfunction he identified as a defect was a manufacturing or a design defect.

After disassembling and inspecting the transaxle on December 6, 2011, DeHarde did not prepare a supplemental report. Instead, on December 22, 2011, the Dykes filed and served their attorney's narration in the form of an unverified disclosure titled "Plaintiffs' Supplemental Designation of Expert Witnesses." The three so-called opinions set forth by the Dykes' counsel in the supplemental disclosure are:

(1) The drive key is located deep inside the transaxle and would be difficult to break through abuse or misuse;

---

[6] The Court refers to DeHarde's expert report of September 30, 2011, as his "initial" report. However, it is the only expert report tendered by him in this case. As will be discussed more fully hereinafter, the Dykes' counsel tried to supplement DeHarde's report with a subsequent document styled "Plaintiff's Supplemental Designation of Expert Witnesses" on December 22, 2011, after the close of discovery. It is an improper supplementation of an expert report and Husqvarna has moved to exclude it. However, even considering the content of the attempted "Supplementation" does not get the Dykes over the hump of summary judgment as discussed later in this opinion.

(2) Mr. DeHarde did not find any signs of any alteration or changes to the transaxle and saw no indication that the transaxle had been abused or misused in any way; and

(3) Inspection of the specific drive key (or portion broken therefrom) shows what appears to be a fatigue break which in Mr. DeHarde's opinion would be a manufacturing defect and one that was present when the transaxle (and mower it was attached to) left the factory.

(*See* Plaintiffs' Supplemental Designation of Expert Witnesses).  The Dykes' counsel's statements were not initially adopted by DeHarde and not provided to a reasonable degree of engineering certainty.  Further, at the end of the disclosure, the Dykes stated that they "reserve the right to supplement these opinions after receipt of any metallurgical testing."  No metallurgical testing results have been provided, nor were any supplemental opinions disclosed.

However, in response to this motion, DeHarde furnished an affidavit stating that after the disassembly of the transaxle, he "advised [the Dykes' counsel] of my additional opinions and worked with him to provide a supplemental expert designation with my additional observations and opinions contained therein."  DeHarde's affidavit also provided that all of his opinions "were provided within a reasonable degree of engineering certainty based upon my education, training, experience and licensure as a professional engineer."  DeHarde also stated that, in his opinion, metallurgical testing was not necessary to support his opinions.

Husqvarna argues, that even assuming *arguendo* that the Dykes' Supplemental Disclosure is considered by this Court, they still have failed to identify a specific defect in the tractor.  DeHarde's report simply acknowledges that a key was broken in the transaxle and states "[i]nspection of the specific drive key (or potion broken therefrom)

13

shows what appears to be a fatigue break which in Mr. DeHarde's opinion would be a manufacturing defect and one that was present when the transaxle (and mower it was attached to) left the factory." No further information or explanation is provided by DeHarde to support this naked assertion as to how this shift key deviated from manufacturing specifications or other identical units.

In *Shelter Ins.*, the plaintiff claimed that a Mercedes car battery was defectively manufactured and caused a fire in its insureds' home. 236 Fed.Appx. at 46. Shelter did not attempt to prove that the battery deviated from manufacturing specifications or other identical units, but argued instead that "the single fact that the battery caught fire necessarily proves that the battery was defectively manufactured." *Id.* at 47. The trial court found that Shelter did not comply with the plain language of the statute, and granted a directed verdict for Mercedes. The Fifth Circuit affirmed, holding:

> For the reasons stated by the district court in its oral ruling, we AFFIRM. We need look no further than the plain language of the Mississippi statute. Appellants were required to prove that the battery *deviated. See id.* at § 11-1-63(a)(i)1. They failed to even attempt to do so. Rather, they attempted to prove only that the battery malfunctioned. As a result, they necessarily failed to prove an essential element of their claim.

*Id.* at 47-48 (emphasis in original).

Here, the Dykes have offered no proof that the shift key in their tractor "deviated in a material way from either manufacturing specifications or from other identical units manufactured to those same specifications". Their expert, DeHarde, has not reviewed any manufacturing specifications for this transaxle and has not performed any metallurgical examination of the broken key. In fact, other than noting that the tractor did not function as intended, DeHarde did not opine that the transaxle, or the shift key,

deviated in any way from the specifications or from other units.  The Dykes cannot cite to any evidence that the key was not made to specification or was not made like other identical units.

David Hypes, an engineering manager with Peerless Gears, a division of Husqvarna which manufactured the transaxle, was deposed in this case and testified that he has extensive knowledge and experience regarding the design and manufacture of the transaxle at issue.  No design changes have been made to the transaxle since 2004 other than with respect to the bolts assembled into the housing of the transmission.  Nor was Hypes aware of any changes made to the transaxle prior to 2004.  Hypes, who has been an engineer working on the design and manufacture of transaxles for over ten years has never seen a key broken this way and can offer no other explanation for this broken key other than abuse or misuse.  Hypes also testified that Husqvarna is not aware of another key which has broken in this fashion.  It should be recalled at this point that Rhonda testified that she improperly shifted by "shifting on the fly," directly contrary to a warning in the Operator's Manual supplied with the tractor and thereby compromising the integrity of the transaxle, according to Husqvarna.

Additionally, Husqvarna contends that the Dykes have not offered proof that their used tractor was defective at the time it left Husqvarna's control, another essential element of their claim.  To support this argument, Husqvarna points to the testimony of DeHarde, who opines that "[a] defect exists within the transaxle which may have been present when it left the manufacturer."

There is no dispute that the tractor at issue is not a new product as it has been owned and operated by at least three different people.  Other than the testimony of the

Dykes regarding their use and maintenance of the tractor for the short time they owned and operated it, there is no evidence in the record to establish the maintenance and use history of this tractor.

The MPLA codified what has long been a requirement in Mississippi products liability jurisprudence that the defect which is claimed to be the proximate cause of harm existed when the product left the possession of the manufacturer. Miss. Code Ann. §11-1-63(a); *see e.g. State Stove Manufacturing Company v. Hodges*, 189 So.2d 113, 122 (Miss. 1966) (*cert. denied sub non., Yates v. Hodges*, 389 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967)); *Early-Gary, Inc. v. Walters*, 294 So.2d 181 (Miss. 1974); *William Cooper and Nephews, Inc. v. Pevey*, 317 So.2d 406 (Miss. 1975). The plaintiff has the burden of proving that when the accident occurred there had been no substantial change in the condition in which the product left the manufacturer. Miss. Code Ann. §11-1-63(a); *BF Goodrich, Inc. v. Taylor*, 509 So.2d 895 (1987).

Proof of a malfunction of machinery in and of itself is not proof of a manufacturing defect under Mississippi law. *BFGoodrich*, 509 So.2d at 903. The Mississippi Supreme Court has stated that "[w]hile it may be true that in many cases proof of a malfunction will in and of itself be proof of a defect in manufacture, it is not necessarily always the case. *Id.; see also Cather v. Catheter Technology Corp.*, 753 F.Supp. 634, 638 (S.D.Miss. 1991) (granting summary judgment on Cather's design and manufacturing defect claims where plaintiff offered nothing more than conclusory allegation that because catheter broke it must have been defective).

A plaintiff may prove by circumstantial evidence that the defect existed in the product at the time it left the manufacturer's control. *BFGoodrich*, 509 So.2d at 903-904

(citing *Falstaff Brewing Corp. v. Williams*, 234 So.2d 620, 623 (Miss. 1970) and *Coca-Cola Bottling Co., Inc. v. Reeves*, 486 So.2d 374 (Miss. 1986)). However, the evidence adduced must be "sufficient to allow 'a reasonable juror to conclude that it was more probable than not that the [product] immediately prior to the accident was in substantially the same condition as when it left the hands of [the manufacturer].'" *Hammond v. Coleman Co., Inc.* 61 F.Supp.2d 533, 541-542 (S.D.Miss. 1999) (citing *Daniels v. GNB, Inc.*, 629 So.2d 595 (Miss. 1993).

Moreover, when circumstantial evidence is required to show that the product is defective, a plaintiff must establish that the product is in substantially the same condition as when it left the manufacturer's control, there must be evidence which tends to show that the product has not been damaged, used abnormally or subject to misuse or modification. *See, e.g., Reeves*, 486 So.2d at 383. (Holding that the absence of any fact tending to show abnormal use over the course of six days while case of Coke sat on store shelf was sufficient circumstantial evidence to establish substantially same condition).

In this case, the only factual evidence regarding the tractor's use, operation, repair, servicing or history is that it operated normally when it left Husqvarna's control, it had been involved in at least one large impact, and it had been arguably poorly maintained. There is no other evidence about who or how at least two and possibly more users operated or cared for the tractor prior to "August, September, end of 2006." Given the available evidence, it would be difficult to reasonably conclude that the tractor was subjected to nothing more than "normal" use such that an inference of "substantially the same condition" could be drawn.

17

Further, it is undisputed that after the Dykes came into possession of the tractor, Rhonda improperly used the tractor by shifting without stopping – an action that has a direct effect on the shift keys.  Indeed, this fact alone would tend to preclude a "same condition" finding.  Thus, based on the factual evidence, the Court finds that a reasonable jury could not conclude that it is "more probable than not" that the tractor – or transaxle – was in substantially the same condition as when it left Husqvarna's control.

Because the Dykes have not offered proof on essential elements of their case – namely, that the used 2004 Craftsman riding tractor "deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications," or that it was defective "at the time the product left the control of the manufacturer," their case must fail and summary judgment for Husqvarna shall be granted on the manufacturing defect claim.

**Design Defect**

The Dykes' Amended Complaint asserts a cause of action for design defect.  For such a claim, the MPLA provides:

> (b)  A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

and,

> (f)  In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and

(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

Miss. Code Ann. § 11-1-63(b), (f)(i), (ii).

In order for a plaintiff to prove a product is unreasonably dangerous due to a design defect, one of the main elements he must offer proof of, and ultimately prove, is that the product "failed to function as expected" at the time it left the control of the manufacturer. *See Austin v. Will-Burt Co.*, 361 F.3d 862, 872 (5th Cir. 2004).

The Dykes have not even attempted to offer proof of whether or not the tractor functioned as expected when it left the manufacturer, but instead argue that it failed to function as expected on the date of the accident, several years after its purchase and entry into service. Directly contrary to the Dykes' assertion is the undisputed evidence showing this tractor was tested prior to leaving Husqvarna's control and that it passed with no issues. Thus the Court finds that the Dykes have wholly failed to show that the tractor failed to function as expected on the date it left the manufacturer. Failure to offer proof that the tractor failed to function as expected when it left the manufacturer is fatal to the Dykes' design defect claim.

**<u>Inadequate Warnings</u>**

The Dykes' Amended Complaint also contains claims of inadequate warnings and breach of warranty, at least facially. For a claim of inadequate warnings, the MPLA

further provides:

> (c)(i)   In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

> (ii) An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product; or in the case of a prescription drug, medical device or other product that is intended to be used only under the supervision of a physician or other licensed professional person, taking into account the characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribes the drug, device or other product.

and,

> (e)  In any action alleging that a product is defective pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the danger posed by the product is known or is open and obvious to the user or consumer of the product, or should have been known or open and obvious to the user or consumer of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product.

Miss. Code Ann. § 11-1-63(c)(i), (ii), (e).

In Mississippi, a warning may be held adequate as a matter of law where the adverse effect was one that the manufacturer specifically warned against.  *Austin v. Will-Burt Co.*, 361 F.3d at 878 (citing *Cather v. Catheter Tech. Corp.*, 753 F.Supp. 634, 640 (S.D.Miss.1991)).  The Dykes have offered no evidence or expert testimony to support this claim.  As such, Husqvarna is entitled to summary judgment. The same is true as the to their breach of warranty claims.

## Negligence

The Dykes have also set forth negligence claims in Paragraphs 11-13 of their Amended Complaint.  While a plaintiff may bring a common-law negligence claim in addition to a products liability claim under the Mississippi Products Liability Act, the requirements of the MPLA are still applicable.  *McSwain v. Sunrise Med., Inc.*, 689 F. Supp. 2d 835 (S.D. Miss. 2010).  However, since the Court has found that the Dykes cannot prove their MPLA claims, neither can they prove their redundant negligence claims.  *McSwain,* 689 F. Supp. at 840.  Therefore, summary judgment is appropriate as to the Dykes' negligence claims.

## Punitive Damages

As to the punitive damages claim asserted by the Dykes, such are not available absent an award of compensatory damages.  *See* Miss. Code Ann. § 11-1-65(1)(a)-(d); and *Bradfield v. Schwartz*, 936 So.2d 931, 937 (Miss. 2006).  Since the Court has concluded that the Dykes may not proceed on their compensatory claims, they are not entitled to punitive damages.  Additionally, the Dykes have admitted that summary judgment is proper on their claims for punitive damages.  Specifically, in their response to this motion, they state:

> Admittedly, Plaintiffs' claims for punitive damages cannot be supported based upon the proof in the record at this time. While the lack of any other prior problems with this particular transaxle does not provide proof that there was no defect, it does at least tend to prove that there was no prior warning to the Defendant which might provide for a claim of recklessness or intentional conduct. For this reason, Plaintiff[s] confess[] the motion to the extent that a genuine issue of material fact cannot be created a[s] to Plaintiffs' claim for punitive damages.

**CONCLUSION**

The evidence produced in this case reveals that the Dykes are unable to establish an actual defect and are unable to trace any alleged defect back to the point in time when the tractor left Husqvarna, both necessary prerequisites to their claims. Thus the Court concludes that in their Response to Husqvarna's Motion for Summary Judgment, as well as all other documents and information submitted, the Dykes have failed to establish a genuine issue of material fact and, therefore, summary judgment is proper as to all claims and that the Amended Complaint should be dismissed.

IT IS THEREFORE ORDERED AND ADJUDGED that the defendant's Motion for Summary Judgment **[#87]** is Granted and the Plaintiffs' Complaint is dismissed with prejudice and that all other pending motions are denied as moot. A separate judgment shall be entered herein in accordance with rule 58, Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this the 19th day of April, 2012.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE